*1058744721*

C524 3538 -
TJ Mmmons

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

CJ 2024-3538

| | |
|---|---|
| JANE DOE, Individually, and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff | ) ) |
| v. | ) ) |
| LAKESIDE WOMEN'S HOSPITAL, LLC d/b/a LAKESIDE WOMEN'S HOSPITAL, | ) ) ) |
| Defendant. | ) ) |

Case No. _____

**Attorney Lien Claimed**

**Jury Trial Demanded**

CJ 2024-3538

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAY 3 0 2024

RICK WARREN
COURT CLERK

50 _____

### CLASS ACTION PETITION

Plaintiff, JANE DOE, Individually, and on behalf of all others similarly situated, (hereinafter "Plaintiff") brings this Class Action Petition against Defendant, LAKESIDE WOMEN'S HOSPITAL, LLC d/b/a LAKESIDE WOMEN'S HOSPITAL ("LWH," or "Defendant"), and alleges, upon personal knowledge as to her own actions, and upon information and belief as to all other matters, as follows.

### INTRODUCTION

1. Plaintiff brings this class action to address Defendant's outrageous, illegal, and widespread practice of disclosing the confidential Personally Identifying Information[1] ("PII") and/or Protected Health Information[2] ("PHI") (collectively referred to as "Private Information")

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in

1

**EXHIBIT 1**

of Plaintiff and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"), Google, LLC ("Google"), Microsoft, Bidtellect/Simpli.Fi, The Trade Desk, MediaMath, LinkedIn, and StackAdapt, and likely others ("the Disclosure").

2.    The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant,' that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[3] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[4] OCR and FTC warn that "[i]mpermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss,

---

relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information.* "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule,* DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). LWH is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.
[3] *Re: Use of Online Tracking Technologies*, U.S. Dep't of Health & Human Services (July 20, 2023), available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last accessed April 9, 2024), **attached as Exhibit A.**
[4] *Id.*

**EXHIBIT 1**

discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[5]

3.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.    Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider may disclose a person's personally identifiable protected health information to a third party without express written authorization.

5.    On March 18, 2024, HHS updated its December 2022 bulletin, reiterating:

**Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals'

---

[5] *Id.*

3

**EXHIBIT 1**

HIPAA-compliant authorizations, would constitute impermissible disclosures. [6,7,8]

6.      Located in Oklahoma City, Oklahoma, Defendant is a hospital which provides Oklahomans with specialized "[h]ealth care designed exclusively for women."[9]

7.      Despite its unique position as a trusted healthcare provider, Defendant knowingly configured and implemented into its website, https://lakeside-wh.com/ (the "Website") code-based tracking devices known as "trackers" or "tracking technologies," which collected and transmitted patients' Private Information to Facebook, and other third parties, without patients' knowledge or authorization.

8.      Defendant encourages patients to use its Website, along with its various web-based tools and services (collectively, the "Online Platforms"), to learn about LWH,[10,11] to find doctors,[12] to find medical services,[13] to access a patient portal via a pre-portal login page,[14] to pay bills,[15] and more.

9.      Plaintiff and the Class Members visited Defendant's Online Platforms in relation to their past, present, and future health, healthcare and/or payment for health care.

---

[6] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022, updated Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last acc. May 3, 2024).

[7] Citing *to* 45 CFR 164.508(a)(3); *see also* 45 CFR 164.501 (definition of "Marketing").

[8] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Updated March 18, 2024), avail at. https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis in original) (last acc. May 3, 2024).

[9] https://lakeside-wh.com/ (last acc. May 3, 2024).

[10] *Id.*

[11] https://lakeside-wh.com/about (last acc. May 3, 2024).

[12] https://lakeside-wh.com/doctors (last acc. May 3, 2024).

[13] https://lakeside-wh.com/services (last acc. May 3, 2024).

[14] https://www.integrisandme.com/ (last acc. May 3, 2024).

[15] https://www.integrisok.visitpay.com/#/ (last acc. May 3, 2024).

**EXHIBIT 1**

10.    When Plaintiff and Class Members used Defendant's Websites and Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded pixels from Facebook and others into its Website and Online Platforms, surreptitiously forcing Plaintiff and Class Members to transmit intimate details about their medical treatment to third parties without their consent.

11.    A tracker (also referred to as "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[16] When a person visits a website with an tracker, it tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[17] Then, the tracker transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[18]

12.    Among the trackers Defendant embedded into its Website is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a website user's device and the URLs and domains they visit.[19] When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[20] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to

---

[16] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed May 13, 2024).
[17] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 13, 2024).
[18] *Id.*
[19] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 13, 2024).
[20] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 13, 2024).

**EXHIBIT 1**

be linked with their Facebook profile.[21]

13.    Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiff's and Class Members' private health information, alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

14.    Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI") alongside use of the Meta Pixel.[22]

15.    Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interactions from the website owner's private servers, which transmits the data directly to Facebook, without involvement from the website user's browser.[23, 24]

---

[21] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited May 13, 2024).

[22] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited May 13, 2024).

[23] What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/ (last updated May 13, 2024).

[24] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited May 13, 2024).

**EXHIBIT 1**

16.     Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly. For this reason, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[25]

17.     Defendant utilized data from these trackers to market its services and bolster its profits. Facebook utilizes data from the Meta Pixel and CAPI to build data profiles for the purpose of creating targeted online advertisements and enhanced marketing services, which it sells for profit.

18.     On information and belief, the information that Defendant's Meta Pixel, and possibly CAPI, sent to Facebook included the Private Information that Plaintiff and the Class Members submitted to Defendant's Website and Online Platform, including, *inter alia,* the pages they viewed; the buttons they clicked; their physician searches; their medical services searches; their statuses as patients; as well as their identifying information, such as IP addresses and identifying cookies.

19.     Such information allows third parties (e.g., Facebook) to learn of a particular individual's health conditions and seeking of medical care. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers, who then target Plaintiff and Class Members with online advertisements, based on the information they communicated to Defendant

---

[25] About Conversions API, META FOR DEVELOPERS,
https://www.facebook.com/business/help/2041148702652965 (last visited May 13, 2024).

**EXHIBIT 1**

via the Website. Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

20.     In addition to the Facebook Pixel, and likely CAPI, on information and belief, Defendant installed other tracking technologies, which operate similarly to the Meta Pixel and transmitted Plaintiff's and Class Members' Private Information to unauthorized third parties.

21.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send their private health information to a hidden third party—let alone Facebook, a company with a sordid history of violating consumer privacy in pursuit of ever-increasing advertising revenue.

22.     Neither Plaintiff nor any Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or other third parties uninvolved in their treatment.

23.     Despite willfully and intentionally incorporating the Meta Pixel, potentially CAPI, and other third-party trackers into its Website and servers, Defendant have never disclosed to Plaintiff or Class Members that it shared their Information with Facebook, and possibly others.

24.     Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant.

25.     Defendant owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members' communications and Private Information safe, secure, and confidential.

26.     Upon information and belief, Defendant utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract

**EXHIBIT 1**

new patients, and generate sales.

27.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.

28.     Defendant breached its common law and statutory obligations to Plaintiff and Class Members by, *inter alia*, (i) failing to adequately review its marketing programs and web-based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook, and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiff's and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

29.     Plaintiff seeks to remedy these harms and brings causes of action for (I) Negligence; (II) Negligence *Per Se*; (III) Invasion of Privacy—Intrusion Upon Seclusion; (IV) Breach of Implied Contract; (V) Unjust Enrichment; (VI) Breach of Fiduciary Duty; and (VII) Violation of the Oklahoma Consumer Protection Act, Okla. Stat. Ann. tit. 15 § 751, *et seq.* ("OCPA").

## PARTIES

30.     Plaintiff, JANE DOE, is a natural person and resident and citizen of Oklahoma, where she intends to remain, with a principal residence in Bethany, Oklahoma in Oklahoma

**EXHIBIT 1**

County. She is a patient of Defendant and a victim of its unauthorized Disclosure of Private Information.

31.     Defendant, LAKESIDE WOMEN'S HOSPITAL, LLC d/b/a LAKESIDE WOMEN'S HOSPITAL ("LWH," or "Defendant") is a limited liability company organized and existing under the law of the State of Oklahoma with its principal place of business at 11200 N. Portland Avenue, Oklahoma City, Oklahoma 73120 in Oklahoma County.

32.     Defendant's Registered Agent for Service of Process is Brent Hubbard, 3001 Quail Springs Parkway, Oklahoma City, Oklahoma 73134.

## JURISDICTION AND VENUE

33.     This Court is a court of general jurisdiction that has jurisdiction over the subject matter of this action by virtue of Okla. Const. Art.7 § 7 and enacting legislation.

34.     This Court has personal jurisdiction over Defendant as LWH regularly and systematically conducts business and provides health care services in this judicial district and county, including to Plaintiff and other members of the proposed Class.

35.     Venue is proper in this County by virtue of Okla. Stat. Ann. tit. 12 § 134.

## COMMON FACTUAL ALLEGATIONS

### A. Background

36.     Founded in 1997, Defendant provides specialized medical care to women in the Oklahoma City metropolitan area in its "fully Licensed Joint Commission accredited hospital designed exclusively for women."[26]

37.     As LWH describes itself and represents to patients and prospective patients:

Compassionate care and specialized women's health services are at the core of everything we do at Lakeside Women's Hospital. Here, you don't become a

---

[26] https://lakeside-wh.com/about (last acc. May 3, 2024).

**EXHIBIT 1**

"patient." You join a sisterhood of mothers, daughters, mothers-to-be, grandmothers and wives. It's women making the best of every stage of life – and who want the care to match. From routine well-woman visits, to pregnancy and childbirth, gynecological surgery or menopausal care, we focus on the health and well-being of every woman....[27]

38.    Defendant touts itself as "Oklahoma City's first full-service women's health care facility featuring many options not offered in the same setting before, including: Convenient, same day, all-in-one location for mammograms and yearly exams […and] offer[ing] medical services for women of all ages with a focus on overall health and well-being."[28]

39.    LWH provides a wide range of specialized medical services to Oklahoman women, including: Clinical Services (e.g., Hormone Replacement Therapy, and the Pelvic Health Program);[29] Hospital Services (Breast Surgery, Gynecological Surgical Services, Colonoscopy, General Surgery, Urogynecologic, and Robotic Surgery);[30] Radiology Services (Mammography, Osteoporosis and Bone Density Testing, and Ultrasound);[31] and, Labor and Delivery care (including delivery rooms, nurseries, lactation consultants, and Breastfeeding educators).[32, 33]

40.    In 2013, Defendant began partnering with INTEGRIS Health Network, "the largest health care system in Oklahoma"[34] which "…brings a long list of comprehensive specialists and services, such as direct access to neonatal intensive care, cardiology, oncology, extensive educational programs, and many more services not directly accessible at Lakeside in the past."[35]

41.    On information and belief, in 2023, LWH generated approximately $177,197,739

---

[27] https://lakeside-wh.com/ (last acc. May 3, 2024).
[28] https://lakeside-wh.com/services (last acc. May 3, 2024).
[29] https://lakeside-wh.com/services/clinical-services (last acc. May 3, 2024).
[30] https://lakeside-wh.com/services/hospital-services (last acc. May 3, 2024).
[31] https://lakeside-wh.com/services/radiology-services (last acc. May 3, 2024).
[32] https://lakeside-wh.com/services (last acc. May 3, 2024).
[33] https://lakeside-wh.com/services/labor-and-delivery (last acc. May 3, 2024).
[34] INTEGRIS Health, https://integrishealth.org/ (last acc. May 3, 2024).
[35] https://lakeside-wh.com/about (last acc. May 3, 2024).

**EXHIBIT 1**

in total patient revenue.[36]

42.    Defendant serves many of its patients via its Website and Online Platforms, which it encourages patients to use to learn about LWH,[37, 38] to find doctors,[39] to find medical services,[40] to access a patient portal via a pre-portal login page,[41] to pay bills,[42] and more.

43.    Defendant promotes the comprehensive functionality of these tools and promotes their use, in service of its own goal of increasing profitability. In furtherance of that goal, Defendant purposely installed the Meta Pixel and other trackers onto its Website, for the purpose of gathering information about Plaintiff and Class Members to further its marketing efforts. But Defendant did not only generate information for its own use: it also shared patient information, including Private Information belonging to Plaintiff and Class Members, with Facebook, Google, and other unauthorized third parties.

44.    To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

### i.    Facebook's Business Tools and the Meta Pixel

45.    Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[43]

---

[36] American Hospital Directory, Lakeside Women's Hospital, avail. at https://www.ahd.com/free_profile/370199/Lakeside_Women_s_Hospital/Oklahoma_City/Oklahoma/ (last acc. May 3, 2024).

[37] *Id.*

[38] https://lakeside-wh.com/about (last acc. May 3, 2024).

[39] https://lakeside-wh.com/doctors (last acc. May 3, 2024).

[40] https://lakeside-wh.com/services (last acc. May 3, 2024).

[41] https://www.integrisandme.com/ (last acc. May 3, 2024).

[42] https://www.integrisok.visitpay.com/#/ (last acc. May 3, 2024).

[43] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited May 13, 2024).

**EXHIBIT 1**

46.    In conjunction with its advertising business, Facebook encourages and promotes its "Business Tools" to be used to gather customer data, identify customers and potential customers, target advertisements to those individuals, and market products and services.

47.    Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

48.    The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, clicks a button, fills out a form, and more.[44] Businesses that want to target customers and advertise their services can also create their own tracking parameters by building a "custom event."[45]

49.    The Meta Pixel is a Business Tool used to "track[] the people and type of actions they take" on a website.[46] When an individual accesses a webpage containing the Meta Pixel, the communications with that webpage are instantaneously and surreptitiously duplicated and sent to Facebook, traveling directly from the user's browser to Facebook's server, based off instructions from the Meta Pixel.

50.    Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate

---

[44] Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655 (last visited May 13, 2024); *see also* Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited May 13, 2024).

[45] About Standard and Custom Website Events, META, https://www.facebook.com/business/help/964258670337005; *see also* Facebook, App Events API, *supra*.

[46] Retargeting, META, https://www.facebook.com/business/goals/retargeting.

**EXHIBIT 1**

patient privacy, such as a homepage, and disable it on pages that do implicate patient privacy, such as Defendant's "Services" pages).

51.    The Meta Pixel's primary purpose is to enhance online marketing, improve online ad targeting, and generate sales.[47]

52.    Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[48]

53.    According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** [Emphasis added.]

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.
**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[49]

54.    Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.

---

[47] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed May 13, 2024).
[48] About Meta Pixel, META,
https://www.facebook.com/business/help/742478679120153 (last accessed May 13, 2024).
[49] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed May 13, 2024).

**EXHIBIT 1**

- **Drive more sales**. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[50]

55.    Facebook likewise benefits from Meta Pixel data and uses it to enhance its own ad targeting abilities.

 *ii.*    ***Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel***

56.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

57.    Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

58.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[51]

59.    GET Requests are one of the most common types of HTTP Requests. In addition

---

[50] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed May 13, 2024).

[51] "Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited May 13, 2024).

**EXHIBIT 1**

to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

60.    When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information. The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

61.    Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

62.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

63.    In this way, the Meta Pixel acts much like a traditional wiretap: intercepting and transmitting communications intended only for the website host and diverting them to Facebook.

64.    Separate from the Meta Pixel, third parties place cookies in the browsers of web users. These cookies can uniquely identify the user, allowing the third party to track the user as they browse the internet—on the third-party site and beyond. Facebook uses its own cookie to identify users of a Meta-Pixel-enabled website and connect their activities on that site to their individual identity. As a result, when a Facebook account holder uses a website with the Meta Pixel, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the user associated with the information it has intercepted.

**EXHIBIT 1**

65.     With substantial work and technical know-how, internet users can sometimes circumvent these browser-based wiretap technologies. To counteract this, third parties bent on gathering data implement workarounds that are difficult for web users to detect or evade. Facebook's workaround is Conversions API, which "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[52] This makes Conversions API a particularly effective tool because it allows sends Facebook data directly from the website server to Facebook, without relying on the user's web browser. Notably, client devices do not have access to host servers containing Conversions API, and thus, they cannot prevent (or even detect) this transmission of information to Facebook.

66.     While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the website server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."[53]  Consequently, if a website owner utilizes the Meta Pixel on its website, it is also reasonable to infer that it implemented the Conversions API on its website server(s), in accordance with Facebook's documentation.

67.     The Meta Pixel, Conversions API, and other third-party trackers do not provide any substantive content on the host website. Rather, their only purpose is to collect information to be used for marketing and sales purposes.

68.     Accordingly, without any knowledge, authorization, or action by a user, a website

---

[52] About Conversions API, META, https://www.facebook.com/business/help/2041148702652965 (last visited May 13, 2024).
[53] *See* Best Practices for Conversions API, META, https://www.facebook.com/business/help/308855623839366 (last visited May 13, 2024).

**EXHIBIT 1**

owner can use its website source code to commandeer its users' computing devices and web browsers, causing them to invisibly re-direct the users' communications to Facebook, Google, and others.

69.     In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

70.     Consequently, when Plaintiff and Class Members visited Defendant's Website and communicated their Private Information, it was simultaneously intercepted and transmitted to Facebook.

71.     Defendant also employed trackers from Google (DoubleClick Ads, Google Analytics, and Google Tag Manager) Microsoft Universal Events, Bidtellect/Simpli.Fi, The Trade Desk, MediaMath, LinkedIn, and StackAdapt. On information and belief, Defendant likewise transmitted Plaintiff's and the Class Members' Private Information to these third parties without Plaintiff's and Class Members' knowledge or authorization.

### iii.    *Defendant Violated Its Own Privacy Policies*

72.     Defendant maintains and is covered under privacy policies, including the Notice of Privacy Practices of INTEGRIS which is posted on LWH's Website,[54] as well as other policies[55] (collectively, "Privacy Policies").

73.     On information and belief, LWH does not maintain a separate privacy policy for the Website.

---

[54] *Notice of Privacy Practices*, ("Notice of Privacy Practices"), eff. Sept. 1, 2013, avail. at https://lakeside-wh.com/patients-and-visitors/privacy (last acc. May 3, 2024) **attached as Exhibit B.**

[55] *See* https://lakeside-wh.com/patients-and-visitors/patient-information (last acc. May 3, 2024)

**EXHIBIT 1**

74.     The Notice of Privacy Practices states "[t]he INTEGRIS hospitals, clinics and other provider entities (hereafter referred to as 'INTEGRIS') are required to maintain the privacy of your protected health information and to provide you with a notice of our privacy practices."[56]

75.     On information and belief, LWH is included in these "provider entities" to which the Notice of Privacy Practices applies and binds.

76.     The Notice of Privacy Practices goes onto say that:

> To promote quality of care, INTEGRIS maintains an electronic health record ("EHR"). The privacy obligations of INTEGRIS apply to information stored in your EHR. INTEGRIS and the individual members of its professional staffs are providing you with a joint Notice with respect to services provided by INTEGRIS. Please note that the independent members of the professional staffs are neither employees nor agents of INTEGRIS, but are joined under this Notice for the convenience of explaining how, when, and why we use and disclose your PHI. **We will not use or disclose your PHI except as described in this Notice. In certain situations, we must obtain your written authorization in order to use and/or disclose your PHI.** With some exceptions, we may not use or disclose any more of your PHI than is necessary to accomplish the purpose of the use or disclosure. **This Notice applies to all PHI generated or maintained by INTEGRIS facilities.**[57]

77.     In the Notice of Privacy Practices, Defendant acknowledges, represents, and promises that it "…must obtain your authorization for any use or disclosure of PHI for marketing, except if the communication is in the form of: (a) a face-to-face communication made by INTEGRIS to an individual; (b) a promotional gift of nominal value; or (c) falls under an exception recognized by HIPAA."[58]

78.     As LWH's Notice of Privacy Practices continues to describe, "…with some exceptions, marketing includes any type of communication for treatment and health care operations when INTEGRIS is paid to provide the communication. If we receive any form of

---

[56] *Notice of Privacy Practices*, **Exhibit B.**
[57] *Id.* (emphasis added).
[58] *Id.*

**EXHIBIT 1**

payment for a marketing communication, we must obtain your authorization and tell you that payment is involved."[59]

79.    In addition, the Notice of Privacy Practices enumerates certain purposes for which Defendant may disclose PHI/Private Information without authorization, including for purposes of treatment ("We may use your PHI to provide you with medical treatment and services. We may disclose your PHI to physicians, nurses, technicians, medical students, and other health care personnel who need to know your PHI for your care and continued treatment…"); payment ("We may use and disclose your PHI for the purpose of determining coverage, billing, collections, claims management, medical data processing, and reimbursement…"); and Healthcare Operations ("We may use and disclose your PHI during healthcare operations. These uses and disclosures are necessary to run the hospital and make sure our patients receive quality care. Common examples include conducting quality assurance, performance improvement, utilization review, medical review, peer review, internal auditing, investigation of complaints, accreditation, certification, licensing, credentialing, medical research, training and education…").[60]

80.    Furthermore, under the Notice of Privacy Practices, LWH may disclose PHI without authorization for purposes of:

- Emergencies;

- Mental Health/Substance Abuse ("In certain circumstances, we may not disclose your PHI, including psychotherapy notes, to you without the written consent of your physician or to others without your written authorization or a court order.");

---

[59] *Id.*

[60] *Id.*

**EXHIBIT 1**

- To family, friends, and caregivers, unless patients object in writing;

- In inpatient hospital directories or to clergy, unless patients object in writing;

- For communications such as "appointment reminders, refill reminders, financial clearance, or to obtain additional information[;]"

- For "Health-Related Business and Services: Provided we do not receive any payment for making these communications, we may use and disclose your PHI to tell you of health- related products, benefits or services related to your treatment, case management, care coordination, or to direct or recommend alternative treatments, therapies, providers or care settings[;]"

- In a Health Information Exchange;

- To Business Associates ("We may disclose your PHI to business associates with whom we contract to provide services on our behalf. Examples of business associates include copy services used to copy medical records, consultants, accountants, lawyers, medical transcriptionists and third-party billing companies. We will only make these disclosures if we have received satisfactory assurance that the business associate will properly safeguard your PHI. Each business associate is required to receive satisfactory assurances from its subcontractors that they will likewise properly safeguard your PHI.");

- For research;

- In a "Limited Data Set" ("…[W]e may give the "limited data set" that includes your information to others for the purposes of research, public

**EXHIBIT 1**

health action or health care operations. We must make reasonable efforts to limit use, disclosure of, and requests for PHI to the *minimum necessary* to accomplish the intended purpose of the use, disclosure or request. The persons who receive "limited data set " are required to agree to take reasonable steps to protect the privacy of your medical information.");

- For "Limited Marketing Purposes" as set forth above;
- In connection with workers' compensation programs;
- "[T]o provide legally required notices of unauthorized access to or disclosure of your health information[;]"
- To regulatory agencies;
- To law enforcement, under specified conditions;
- In lawsuits and disputes ("If you are involved in a lawsuit or dispute, we may disclose your PHI in response to a valid court or administrative order. In limited circumstances, we may disclose PHI in response to a subpoena, discovery request or other lawful process, when required by law."); and in judicial and administrative proceedings;
- For public health purposes as required or permitted by law;
- For Specific Government Functions such as for national security purposes;
- As required by military command authorities for armed forces members;
- For inmates, to correctional institutes and law enforcement;
- "[T]to avoid a serious threat to the health and safety of a person or the Public[;]"
- For minors, to schools for immunization reporting purposes;

**EXHIBIT 1**

- For deceased individuals, pursuant to court order or written release of the personal representative;

- To coroners, medical examiners, and funeral directors; and,

- As otherwise required by law.[61]

81.     None of the foregoing purposes in the Notice of Privacy Practices include Defendant's Disclosure of patients' PHI/Private Information to third parties uninvolved in their treatment, for marketing purposes without their authorization.

82.     In fact, in the Notice of Privacy Practices, Defendant reiterates that "[w]e will not directly or indirectly receive remuneration or payment in exchange for any PHI unless INTEGRIS obtains a valid authorization that includes a specification  of whether the PHI can be further exchanged for remuneration by the entity receiving PHI of the individual..." subject to exceptions not applicable here; and that "[w]e must obtain a separate authorization from you to use or disclose your PHI for situations not described in this Notice."[62]

83.     As stated prior, upon information and belief, Defendant does not maintain a separate privacy policy concerning its Website and Online Platforms.

84.     However, LWH makes further representations and promises on its Website to protect the confidentiality of patient PHI, stating:

---

[61] *Id.*
[62] *Id.*

23

**EXHIBIT 1**

**Confidential Information**

You have been (or will be) asked for personal and medical information that will help us care for you. Lakeside is committed to a high level of confidentiality concerning this information. If you have special confidentiality needs please let your nurse know.

Our medical records department will require your authorization for release except in the case of your transfer to another health care facility, or as required by law or a third party payment contract.

Your patient responsibilities and rights, as well as your rights related to protecting your privacy are given in detail upon admission to Lakeside Women's Hospital. We value your rights and privacy. If you have additional questions regarding these rights once you have read them please contact our Lakeside Privacy Officer at 405-936-1370. [63]

85.     Despite these representations in its Privacy Policies, Defendant does indeed transfer Private Information to third parties for marketing purposes, without written authorization. Using the Meta Pixel and other tracking technologies, Defendant used and disclosed Plaintiff's and Class Member's Private Information and confidential communications to Facebook, and likely other unauthorized third parties, without written authorization, in violation of LWH's Privacy Policies.

### iv.     *Defendant Unauthorizedly Disclosed Plaintiff's and the Class's Private Information via the Meta Pixel and Related Tracking Technologies*

86.     Defendant disclosed Plaintiff's and Class Members' Private Information and confidential communications to Facebook and other third parties such as Google, Microsoft, Bidtellect/Simpli.Fi, The Trade Desk, MediaMath, LinkedIn, and StackAdapt via the Meta Pixel and other tracking technologies, without their authorization, for marketing purposes.

87.     On information and belief, through the use of the Meta Pixel, Defendant disclosed to Facebook the Private Information and communications that Plaintiff and the Class Members submitted to Defendant's Website including, *inter alia,* the pages they viewed; the buttons they clicked; their physician searches; their medical services searches; their statuses as patients; as well

---

[63] https://lakeside-wh.com/patients-and-visitors/patient-information (last acc. May 3, 2024)

**EXHIBIT 1**

as their identifying information, such as IP addresses and identifying cookies.

88.    Defendant disclosed its users' data to Facebook from as early as January 2, 2016 through at least June 5, 2023.

89.    LWH previously installed additional third-party advertising, analytic, and other tracking scripts. Beginning at least as early as January 2, 2016, LWH installed a Google Tag Manager container with ID GTM-NGGST6 ("**GTM1**"). Archives of GTM1 show that LWH installed a Meta Pixel with ID 917005915018648 ("**Pixel1**") via GTM1.

90.    By April 11, 2018, LWH began to install a different Google Tag Manager container with ID GTM-PW7G7R6 ("**GTM2**"). This is the same Google Tag Manager container installed on LWH's present day website.

91.    Based upon archives of GTM2 from January 12, 2018 through January 12, 2023, LWH installed a Meta Pixel with ID 134108170588466 ("**Pixel2**").

92.    Additionally, beginning no later than September 8, 2021, LWH added a third Meta Pixel with ID 755487525311521 ("**Pixel3**") to its GTM2 configuration.

93.    LWH continued to install Pixel2 and Pixel3 until at least June 5, 2023.

94.    Accordingly, LWH disclosed its users' data to Facebook from at least as early as January 2, 2016 through at least June 5, 2023.

95.    For example, as of May 2023, Defendant utilized the Meta Pixel on the website homepage;[64] LWH's "Our Doctors" page patients use to find doctors;[65] on its Services pages to find medical services,[66] as well as on the pre-portal login page for the patient portal.[67]

---

[64] https://lakeside-wh.com/ (last acc. May 3, 2024).
[65] https://lakeside-wh.com/doctors (last acc. May 3, 2024).
[66] https://lakeside-wh.com/services (last acc. May 3, 2024).
[67] https://www.integrisandme.com/ (last acc. May 3, 2024).

**EXHIBIT 1**

96.    On January 2, 2023 LWH installed the following third-party advertising, analytic, and other tracking scripts: Google DoubleClick Ads, Microsoft Universal Events, Bidtellect/Simpli.Fi, Facebook Events, The Trade Desk, MediaMath, LinkedIn, StackAdapt, Google Analytics, and Google Tag Manager.

97.    Based on the GTM2 as configured on January 2, 2023 and Pixel2 and Pixel3 as configured on September 8, 2021, Defendant disclosed the following.

98.    LWH used its Meta Pixels to track users' browsing activities across its website. Upon a user's arrival on the LWH homepage, LWH sent PageView and Microdata events which disclose that the user was on "Lakeside Women's Hospital | INTEGRIS Health" page and that "[c]ompassionate care and specialized women's health services are at the core of everything we do at Lakeside Women's Hospital."

99.    As users browsed LWH's website beyond the homepage, LWH continued to disclose information about users to Facebook. Through LWH's transmission of Facebook events, LWH disclosed information about users': physician searches; medical services searches; other activities that revealed users' patient status; and identifying information.

### LWH Disclosed Users' Physician Searches

100.    When users searched for a doctor on LWH's website, LWH transmitted events disclosing the users' activities.

101.    LWH's disclosures began by sending a SubscribedButtonClick event to Facebook revealing when a user clicked on the "Doctors" button:

**EXHIBIT 1**



102. Then as the "OKC Doctors - Oklahoma Doctors" page loaded, LWH would transmit a pair of PageView and Microdata events.

103. The Microdata event would inform Facebook that the user was viewing the page to "Search or browse our comprehensive directory to find the best INTEGRIS OKC doctors for you."

104. LWH would continue to report user activities to Facebook as users searched for a doctor. For example, if a user searched for cancer, LWH would first send a SubscribedButtonClick event revealing that the user clicked "SEARCH" on the "doctors/search" page. LWH would then send a Microdata event disclosing the user's search "Query=cancer."

105. Then, when a user clicked to learn about a specific physician, LWH would send SubscribedButtonClick, PageView, and Microdata events.

106. If the user clicked to view Haley Adams' page, for example, the SubscribedButtonClick and Microdata events that LWH would send reveal the user was learning about "Haley Adams, D.O." after searching for a doctor with "Query=cancer."

**EXHIBIT 1**

107.    While on a provider's page, users can click to call the doctor. LWH disclosed that activity to Facebook too. For instance, when the user clicked to call Haley Adams, D.O., LWH would transmit SubscribedButtonClick and WebsitePhoneCalls events.

108.    The SubscribedButtonClick event would inform Facebook that the user clicked to call "tel:918-786-7300" on the "Haley Adams | INTEGRIS Health" after searching "Query=cancer."

109.    Users could also click to get directions to the doctor's office. When a user did so, LWH would disclose this click as well with a SubscribedButtonClick event. The event would indicate that the user clicked "GET DIRECTIONS" and provide Facebook with the doctor's address.

### LWH Disclosed Users' Medical Services Searches

110.    LWH also disclosed users' searches for medical services.

111.    First, LWH would send PageView and Microdata events when users visited the services pages, as shown in the below screenshots of the code:

**EXHIBIT 1**



112.  The Microdata event would inform Facebook that the user was on the "Medical Services in Oklahoma | INTEGRIS Health" page where they could "[f]ind the best medical

**EXHIBIT 1**

services Oklahoma offers with our full range of diagnostic, therapeutic, and primary care."

113.    From this page, users could enter a keyword search query and LWH would disclose the user's query to Facebook. For instance, if a user searched for colon cancer care, LWH would start its disclosures by transmitting a SubscribedButtonClick event.

114.    The event would reveal that the user clicked "SEARCH" on the Medical Services in Oklahoma | INTEGRIS Health" page.

115.    LWH would then send PageView and Microdata events as the search results loaded.

116.    If the user searched for colon cancer, the Microdata event that LWH would transmit informs Facebook that the user searched "Query=colon+cancer" on the "services/search" page.

117.    LWH would also disclose the user's activities as they interacted with their search results. For example, if the user clicked to learn more about "Colorectal Cancer," LWH would send a SubscribedButtonClick revealing the user's click.

118.    Then as the Colorectal Cancer page loaded, LWH would transmit a pair of PageView and Microdata events. The Microdata event would inform Facebook that the user was learning about "Colorectal Cancer Treatment in Oklahoma."

### LWH Disclosed Users' Activities That Revealed Users' Patient Status

119.    LWH also disclosed users' activities that would reveal their patient status.

120.    For instance, LWH would disclose as users accessed the patient portal.

121.    LWH's disclosures would begin when a user clicked to access the patient information page. LWH would transmit a SubscribedButtonClick event revealing that the user clicked on "Patient Information" to access the page at "https://lakeside-wh.com/patients-and-visitors/patient-information:"

**EXHIBIT 1**



122.  From the patient information page, the user could then click to access the page where users could learn about and access the patient portal ("**Pre-Patient Portal**"). LWH would send another SubscribedButtonClick event revealing when the user clicked on "Patient portal" to load the page at "https://integrishealth.org/services/medical/patient-portal."

123.  As the Pre-Patient Portal page loaded, LWH would transmit PageView and Microdata events informing Facebook that the user was on the "INTEGRIS and Me Patient Portal" page and that "INTEGRIS Health & Me is a patient portal that brings you a secure, powerful suite of new online tools, including the ability to send messages to your physician's office, request appointments online and so much more."

124.  LWH further revealed when a patient clicked to pay their bills via a SubscribedButtonClick event.

125.  The event informed Facebook the user clicked "Pay Bill" to access the page at "https://www.integrisok.com/billpay."

**EXHIBIT 1**

126.    Similarly, LWH would disclose when users requested their medical records. First, LWH would transmit a SubscribedButtonClick event when a user clicked the "Request Medical Records" button.

127.    Then LWH would send Facebook PageView and Microdata events revealing that the user was viewing the "Release of Medical Records" page where "INTEGRIS Health has made accessing health information easier for patients and their representatives by providing several request options."

128.    From this page the user could then click to access their medical records via the patient portal or through a patient request website. LWH would reveal when the user selected either option via SubscribedButtonClick events.

129.    If the user selected the patient portal option, LWH would transmit a SubscribedButtonClick event informing Facebook that the user clicked on "INTEGRIS Health & Me Patient Portal" from the "Release of Medical Records" page.

130.    And if the user chose to use the website option, LWH would send a SubscribedButtonClick event disclosing that the user clicked "Patient Request Website" on the "Release of Medical Records" page to access the page at "https://www.swellbox.com/integris-health-wizard.html."

### LWH Disclosed Users' Identifying Information

131.    Lastly, Defendant disclosed Online Platforms users' identifying information.

132.    In each of the Facebook events that LWH sent to Facebook, LWH included the "c_user" cookie, which Facebook uses to identify users.

133.    Facebook can therefore connect cookie data that LWH transmitted with specific users. Furthermore, Facebook's "Your activity off Meta technologies" report confirms that

**EXHIBIT 1**

Facebook would have received the data LWH shared with Facebook.

> ### v.    *Facebook Receives Private Information from Defendant and then Processes It and Sells Access to the Data in the Form of Targeted Advertisements*

134.    After receiving information from Defendant, Facebook processes it, analyzes it, and assimilates it into its own massive datasets, before selling access to this data in the form of targeted advertisements. Employing "Audiences"—subsections of individuals identified as sharing common traits—Facebook promises the ability to "find the people most likely to respond to your ad."[68] Advertisers can purchase the ability to target their ads based on a variety of criteria: "Core Audiences," individuals who share a location, age, gender, and/or language;[69] "Custom Audiences," individuals who have taken a certain action, such as visiting a website, using an app, or buying a product or bought a product;[70] and/or "Lookalike Audiences," groups of individuals who "resemble" a Custom Audience, and who, as Facebook promises, "are likely to be interested in your business because they're similar to your best existing customers.[71]

135.    Google and other companies process data in a similar manner and use it to build marketing and other data profiles allowing for targeted online advertising.

136.    Defendant could have chosen not to use the Meta Pixel, or it could have configured it to limit the information that it communicated to Facebook, but it did not. Instead, it intentionally selected and took advantage of the features and functionality of the Pixel that resulted in the Disclosure of Plaintiff's and Class Members' Private Information.

137.    Along those same lines, Defendant could have chosen not to use other tracking

---

[68] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited May 13, 2024).

[69] *Id.*

[70] *Id.*

[71] How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Help Center, https://www.facebook.com/business/help/465262276878947 (last visited May 13, 2024).

**EXHIBIT 1**

technologies to track Plaintiff and Class Members private communications and transmit that information to unauthorized third parties. It did so anyway, intentionally taking advantage of these trackers despite the harm to Plaintiff and Class Members' privacy.

138.    Defendant used and disclosed Plaintiff's and Class Members' Private Information to Facebook, and other third parties for the purpose of marketing its services and increasing its profits.

139.    On information and belief, Defendant shared, traded, or sold Plaintiff's and Class Members' Private Information with Facebook, and others in exchange for improved targeting and marketing services.

140.    Plaintiff and the Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties uninvolved in their medical care for marketing purposes. Plaintiff and the Class Members were never provided with any written notice that Defendant regularly disclosed its patients' PHI/Private Information to Facebook, and others, nor were they provided any means of opting out of such disclosures, nor did Plaintiff nor the Class Members ever execute a written authorization permitting the Disclosure. Defendant, nonetheless, knowingly disclosed Plaintiff's Private Information, including PHI, to unauthorized entities including Facebook and used that information for its own gain.

141.    Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

142.    Furthermore, Defendant actively misrepresented that it would preserve the security and privacy of Plaintiff's and Class Members' Private Information, while, in actuality, it was knowingly disclosing this information to unauthorized third parties.

**EXHIBIT 1**

143.    By law, Plaintiff and the Class Members are entitled to privacy in their Protected Health Information and confidential communications. Defendant deprived Plaintiff and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications and Private Information (Personally Identifiable Information, and Protected Health Information); (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook, and others; (3) profited from the Disclosure; and (4) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

## B. Plaintiff's Experience

144.    Plaintiff has been a patient of Defendant since 2021, receiving healthcare services from LWH and physicians in LWH's network, including for obstetrics and gynecological care.

145.    Plaintiff relied on LWH's Website and Online Platforms to communicate confidential patient information, last sometime in 2023. Specifically, she used the Online Platforms to: search for doctors,[72] find medical services,[73] and to access a patient portal via a pre-portal login page.[74]

146.    Plaintiff accessed Defendant's Website and Online Platforms at Defendant's direction and encouragement in relation to her past, present, and future health and healthcare.

147.    Plaintiff reasonably expected that her communications with LWH were confidential, solely between herself and LWH, and that, as such, those communications would not be transmitted to or intercepted by a third party.

148.    Plaintiff provided her Private Information to Defendant and trusted that the

---

[72] https://lakeside-wh.com/doctors (last acc. May 3, 2024).
[73] https://lakeside-wh.com/services (last acc. May 3, 2024).
[74] https://www.integrisandme.com/ (last acc. May 3, 2024).

**EXHIBIT 1**

information would be safeguarded according to LWH's Privacy Policies and the law.

149.    On information and belief, through its use of the Meta Pixel on the Online Platforms, Defendant disclosed to Facebook:

  a.  The pages and content Plaintiff viewed;

  b.  The physicians Plaintiff searched for;

  c.  The treatment services Plaintiff viewed;

  d.  Plaintiff's seeking of medical treatment;

  e.  Plaintiff's status as a patient; and,

  f.  Plaintiff's identity via her IP addresses and/or "c_user" cookie.

150.    By failing to receive the requisite consent, LWH breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

151.    Plaintiff first discovered that Defendant was using the Meta Pixel and other tracking technologies to gather and disclose her Private Information in November 2023.

152.    As a result of LWH's Disclosure of Plaintiff's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Plaintiff now receives targeted health-related advertisements on Instagram, reflecting her private medical treatment information.

153.    Plaintiff paid LWH for medical services and the services she paid for included reasonable privacy and data security protections for her Private Information, but Plaintiff did not receive the privacy and security protections for which she paid, due to Defendant's Disclosure.

154.    Because of Defendant's unauthorized Disclosure of her Private Information, Plaintiff has suffered injuries, including monetary damages; loss of privacy; unauthorized disclosure of this Private Information; unauthorized access to her Private Information by third

**EXHIBIT 1**

parties; use of the Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of her Private Information; lost benefit of the bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of her information.

### C. Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI

155.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[75] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

156.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway.  The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[76]

157.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a

---

[75] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.
[76] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021) https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.

**EXHIBIT 1**

different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[77] When a user was having her period or informed the app of her intention to get pregnant, Flo would inform Facebook, which could then use the data for targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about its secret sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[78]

158.    More recently, Facebook employees admitted to lax protections for sensitive user data. In 2021, Facebook engineers on the ad business product team conceded "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[79]

159.    In June 2022, an investigation by The Markup[80] revealed that 33 of the top 100 hospitals in the nation had the Meta Pixel embedded on their websites.[81] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data" including sensitive

---

[77] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.) https://slate.com/technology/2022/06/health-data-brokers-privacy.html.
[78] *Id.*
[79] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.
[80] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. *See* www.themarkup.org/about (last accessed May 13, 2024).
[81] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

EXHIBIT 1

personal health information whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[82] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[83]

160.    During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites included patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, and patients' names, addresses, email addresses, and phone numbers.[84]

161.    In addition to the 33 hospitals identified by The Markup as having installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[85]

162.    David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated he was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.[86]

**D. Defendant Violated HIPAA Standards**

163.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[87]

---

[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

**EXHIBIT 1**

164.    Guidance from the U.S. Department of Health and Human Services ("HHS") instructs healthcare providers that patient status alone is protected by HIPAA.

165.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data... If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[88]

166.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of her or his protected health information can be made for marketing. ... Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[89]

167.    In addition, HHS's Office for Civil Rights (OCR) issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online

---

[88] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.
[89] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

**EXHIBIT 1**

, tracking technology.[90]

168.    According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[91]

169.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [92]

170.    In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel violates HIPAA Rules.

**E.    Defendant Violated FTC Standards, and the FTC and HHS Take Action**

---

[90] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,
https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.
[91] *Id.*
[92] *Id.* (emphasis in original) (internal citations omitted).

**EXHIBIT 1**

171.    The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[93]

172.    On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[94]

173.    Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[95] and that "[t]her is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[96]

174.    Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id.* According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or

---

[93] *Re: Use of Online Tracking Technologies*, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **attached as Exhibit A.**

[94] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[95] *Id.*

[96] *Id.*

**EXHIBIT 1**

nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[97]

175.    Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[98]

176.    As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

**F. Defendant Violated Industry Standards**

177.    A medical provider's duty of confidentiality is a cardinal rule, embedded in doctor-patient and hospital-patient relationships.

178.    The American Medical Association's ("AMA") Code of Medical Ethics requires the protection of patient privacy and communications, and these rules are applicable to Defendant and its physicians.

179.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core

---

[97] *Statement of the Commission: On Breaches by Health Apps and Other Connected Devices,* U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_com mission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).
[98] *See, e.g., U.S. v. Easy Healthcare Corp.,* Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *In the Matter of BetterHelp, Inc.,* FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *U.S. v. GoodRx Holdings, Inc.,* Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *In the Matter of Flo Health Inc.,* FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.

**EXHIBIT 1**

value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

180.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

181.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

## G. Plaintiff's and Class Members' Expectation of Privacy

182.    At all times when Plaintiff and Class Members provided their Private Information to Defendant, they had a reasonable expectation that the information would remain private and that LWH would not share their Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

## H. IP Addresses are Personally Identifiable Information

183.    Defendant also disclosed Plaintiff's and Class Members' IP addresses to Facebook, Google, and others through its use of the Meta Pixel and other tracking technologies.

184.    An IP address is a number that identifies the address of a device connected to the Internet.

185.    IP addresses are used to identify and route communications on the Internet.

**EXHIBIT 1**

186.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party trackers to facilitate and track Internet communications.

187.    Facebook tracks every IP address ever associated with a Facebook user.

188.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

189.    Under HIPAA, an IP address is Personally Identifiable Information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code," specifically listing IP addresses as an example of PII. *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

190.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

**I.    Defendant Was Enriched by and Benefitted from the Use of Plaintiff's and Class Members' Private Information**

191.    The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was to enhance its marketing efforts and increase profits.

192.    In exchange for disclosing the Private Information of its patients, Defendant was compensated by Facebook, Google, Microsoft, Bidtellect/Simpli.Fi, The Trade Desk, MediaMath, LinkedIn, StackAdapt, and likely others, in the form of enhanced advertising services and more cost-efficient marketing.

193.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of their marketing campaign, Defendant re-targeted patients and potential patients.

45

**EXHIBIT 1**

194.    By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

**J.  Plaintiff's and Class Members' Private Information Had Financial Value**

195.    The data concerning Plaintiff and Class Members, collected and shared by Defendant, has tremendous economic value. Data collected via the Meta Pixel, CAPI, and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements. Targeting works by allowing advertisers to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[99] Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app, or engaging in certain online content.[100] Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."[101]

196.    Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.[102]

---

[99] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited May 13, 2024).
[100] *Id.*
[101] *See* How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Center, https://www.facebook.com/business/help/465262276878947 (last visited May 13, 2024).
[102] *See* Here's How Big Facebook's Ad Business Really Is, CNN, https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html (last visited May 13, 2024).

**EXHIBIT 1**

197.    This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

198.    In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, it described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[103]

199.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[104]

**TOLLING, CONCEALMENT, AND ESTOPPEL**

200.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

201.    Defendant seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing patients with no indication that their Website usage was being tracked and transmitted to third parties. Defendant knew that its Website incorporated Meta Pixel and other trackers, yet failed to disclose to Plaintiff and Class Members that their sensitive

---

[103] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.
[104] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

**EXHIBIT 1**

medical information would be intercepted, collected, used by, and disclosed to Facebook, Google, and others.

202.    Even while exercising due diligence, Plaintiff and Class Members could not have discovered the full scope of Defendant's conduct, because there were no disclosures or other indications that they were interacting with websites employing Meta Pixel or any other tracking technology.

203.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of Plaintiff's Private Information continued unabated through at least June 2023. What is more, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

204.    Plaintiff brings this statewide class action on behalf of herself, and on behalf of other similarly situated persons, defined below as the "Class."

205.    The statewide Class that Plaintiff seeks to represent is defined as follows:

**All Oklahoma citizens whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technologies without authorization.**

206.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards,

48

EXHIBIT 1

sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

207.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

208.    Numerosity: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly used or disclosed by Defendant, and the Class is identifiable within Defendant's records.

209.    Commonality: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include

      a.    whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

      b.    whether Defendant had duties not to disclose the Plaintiff's and Class Members' Private Information to unauthorized third parties;

      c.    whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for non-healthcare purposes;

      d.    whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for unauthorized purposes;

      e.    whether Defendant failed to adequately safeguard Plaintiff's and Class Members' Private Information;

      f.    whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

49

**EXHIBIT 1**

g.   whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

h.   whether Defendant owed a common law duty of care to Plaintiff and the Class;

i.   whether Defendant breached its duty of care to Plaintiff and the Class and was negligent;

j.   whether Defendant committed an invasion of privacy;

k.   whether a contract existed between Plaintiff and the Class and Defendant;

l.   whether Defendant breached the contract with Plaintiff and the Class;

m.   in the alternative, whether Defendant was unjustly enriched;

n.   whether Defendant owed a fiduciary duty to Plaintiff and the Class;

o.   whether Defendant breached that fiduciary duty;

p.   whether Defendant engaged in unfair, unlawful, or deceptive practices by misrepresenting that it would safeguard Plaintiff's and Class Members' Private Information and,

q.   whether Plaintiff and the Class are entitled to damages.

210.   Typicality: Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.

211.   Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards

EXHIBIT 1

of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

212.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff has suffered is typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

213.    Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

214.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device

**EXHIBIT 1**

were not used, Defendant would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

215.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

216.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

217.    Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure of Plaintiff's and Class Members' Private Information and refusal to provide proper notification to and obtain proper consent.

218.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

219.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to

**EXHIBIT 1**

a.   whether Defendant owed a duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b.   whether Defendant breached a duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.   whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

d.   whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e.   whether Defendant breached the implied contract;

f.   whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been used and disclosed to third parties;

g.   whether Defendant failed to implement and maintain reasonable security procedures and practices;

h.   whether Plaintiff and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

53

**EXHIBIT 1**

220.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

221.    Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

222.    Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

223.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' Private Information.

224.    Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

225.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of Private Information of Plaintiff and Class Members. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

226.    As a direct, proximate, and traceable result of Defendant's negligence and/or

**EXHIBIT 1**

negligent supervision, Plaintiff and Class Members have suffered or imminently will suffer damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

227.    Defendant's breach of its common-law duties to exercise reasonable care and negligence, directly and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information and diminution in value, emotional distress, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence. These injuries are ongoing, imminent, immediate, and continuing.

228.    Defendant's negligence directly and proximately caused the unauthorized access and Disclosure of Plaintiff's and Class Members' Private Information, PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual and compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

229.    In failing to secure Plaintiff's and Class Members' Private Information, PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff and Class Members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of themselves and the Class.

**EXHIBIT 1**

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

230.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

231.    Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Private Information.

232.    Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

233.    Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

234.    Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

235.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiff's and Class Members' PII and PHI in compliance with applicable laws would result in an unauthorized third-parties such as Facebook, Google, and others gaining access to Plaintiff's and Class Members' PII and PHI, and resulting in Defendant's liability under principles of negligence *per se*.

236.    Defendant violated its duty under Section 5 of the FTC Act and/or HIPAA by

**EXHIBIT 1**

failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI and not complying with applicable industry standards as described in detail herein.

237.   Plaintiff's and Class Member's PII and PHI constitute personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

238.   As a proximate result of Defendant's negligence *per se* and breach of duties as set forth above, Plaintiff and Class Members were caused to, *inter alia*, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

239.   In failing to secure Plaintiff's and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Class.

240.   Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

## COUNT III
## INVASION OF PRIVACY—INTRUSION UPON SECLUSION

**EXHIBIT 1**

**(On Behalf of Plaintiff and the Class)**

241.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

242.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and Online Platforms.

243.    Plaintiff and Class Members communicated sensitive PHI and PII—Private Information—that they intended for only Defendant to receive and that they understood Defendant would keep private.

244.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion in their private affairs and concerns.

245.    Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's representations in its Notice of Privacy Practices, and elsewhere. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's Disclosure of PHI coupled with PII is highly offensive to the reasonable person.

246.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

247.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

248.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm

**EXHIBIT 1**

to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

249.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

250.    Plaintiff also seeks such other relief as the Court may deem just and proper.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Class)

251.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

252.    As a condition of receiving medical care from Defendant, Plaintiff and the Class Members provided their Private Information to Defendant, and paid compensation to Defendant for the treatment received.

253.    In so doing, Plaintiff and Class Members entered into contracts with Defendant by which Defendant agreed to safeguard and protect such Private Information, in its Notice of Privacy Practices and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached, compromised, or stolen.

254.    Implicit in the agreement between Defendant and its patients, Plaintiff and the proposed Class Members, was the obligation that the parties would maintain the Private Information confidentially and securely.

255.    Defendant had an implied duty of good faith to ensure that the Private Information of Plaintiff and Class Members in its possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from LWH.

EXHIBIT 1

256.    Defendant had an implied duty to protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses.

257.    Additionally, Defendant implicitly promised to keep its patients' Private Information secure and confidential.

258.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant, but Defendant did not. Plaintiff and Class Members would not have provided their confidential Private Information to Defendant in the absence of their implied contracts with Defendant that their Private Information would be kept in confidence and would instead have retained the opportunity to control their Private Information for uses other than receiving medical treatment from Defendant.

259.    Defendant breached the implied contracts with Plaintiff and Class Members by disclosing their Private Information to unauthorized third parties.

260.    Defendant's acts and omissions have materially affected the intended purpose of the implied contracts that required Plaintiff and Class Members to provide their Private Information in exchange for medical treatment and benefits.

261.    As a direct and proximate result of Defendant's breach of contract, Plaintiff and the Class have suffered (and will continue to suffer) injury-in-fact and damages, including monetary damages; loss of privacy; unauthorized disclosure of Private Information; unauthorized access to Private Information by third parties; use of the Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of Private Information; lost benefit of the bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of their information.

262.    As a direct and proximate result of Defendant's above-described breach of

EXHIBIT 1

· contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

## COUNT V
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

263.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

264.    This claim is pleaded solely in the alternative to Plaintiff's other claims outlined above.

265.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive medical information—Private Information—that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, for marketing purposes, and for sale or trade with third parties.

266.    Plaintiff and Class Members would not have used Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Private Information to third parties.

267.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

268.    As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy practices and procedures that Plaintiff and Class Members paid for, and those purchases without unreasonable data privacy practices and procedures that they received.

269.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members themselves. Under unjust enrichment principles, it would

**EXHIBIT 1**

be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Petition.

270.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds they received as a result of the conduct and the unauthorized Disclosure alleged herein.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

271.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

272.    A relationship existed between Plaintiff and the Class, on the one hand, and Defendant, on the other, in which Plaintiff and the Class put their trust in Defendant to protect the Private Information of Plaintiff and the Class, and Defendant accepted that trust.

273.    Defendant breached the fiduciary duty that it owed to Plaintiff and the Class Members by failing to act with the utmost good faith, fairness, and honesty; failing to act with the highest and finest loyalty; and failing to protect and, indeed, intentionally disclosing, their Private Information.

274.    Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damages to Plaintiff and the Class as set forth in the preceding paragraphs.

275.    But for Defendant's breach of fiduciary duty, the injury-in-fact and damages to Plaintiff and the Class would not have occurred.

276.    Defendant's breach of fiduciary duty substantially contributed to the injury and damages to the Plaintiff and the Class.

277.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and demand actual, consequential, and nominal damages,

**EXHIBIT 1**

· injunctive relief, and all other relief allowed by law.

## COUNT VII
## VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
### (Okla. Stat. Ann. tit. 15 § 751 *et seq.*)
### (On Behalf of Plaintiff and the Class)

278.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

279.    The Oklahoma Consumer Protection Act ("OCPA") makes it unlawful to "[c]ommit an unfair or deceptive trade practice," inter alia, "in the course of one's business." Okla. Stat. Ann. tit. 15, § 753(20).

280.    Under the OCPA, a "deceptive trade practice" is "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person." Okla. Stat. Ann. tit. 15 § 752(13). "Such a practice may occur before, during or after a consumer transaction is entered into and may be written or oral[.]" *Id.*

281.    Under the same Act, an "unfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." § 752(14).

282.    Defendant is a "person" as defined in the OCPA because it is a "legal entity." § 752(1).

283.    Defendant's advertising, offering, and provision of health care services to Plaintiff and Class Members are each "consumer transactions" under the OCPA. § 752(2).

284.    In the course of its business, Defendant committed deceptive and/or unfair trade practices, including but not limited to, the following:

     a.    Defendant encouraged Plaintiff and Class Members to use Defendant's Website and Online Platforms while misrepresenting its commitment to protecting the privacy of their Personal Information. At the same time,

EXHIBIT 1

Defendant was not keeping Plaintiff's and Class Members' Private Information private but instead harvesting and disclosing it to Facebook, Google, and other third parties.

b.      Defendant promised Plaintiff and Class Members that it would not use or disclose their health information for marketing purposes without authorization. At the same time, it gathered, used, and disclosed Plaintiff and Class Members' Private Information for the purpose of marketing its services and increasing its profits.

c.      Defendant further promised that it would not sell Plaintiff's and the Class Members' medical information without their signed authorization. On information and belief, Defendant sold, traded, or gave Plaintiff's and Class Member's Private Information to Facebook in exchange for enhanced ad targeting and marketing services.

d.      Defendant omitted from its Privacy Policy its intention to use and disclose Plaintiff's and Class Member's Private Information for unauthorized purposes and without Plaintiff's and Class Members consent. At the same time, it intentionally and knowingly acted to use and disclose Plaintiff's and Class Members' Private Information for unauthorized purposes and without consent.

285.    Had Plaintiff and Class Members been aware that their Private Information would be transmitted to unauthorized third parties, they would not have entered into consumer transactions with Defendant.

286.    As a direct and proximate result of Defendant's unfair and deceptive acts and

64

**EXHIBIT 1**

practices in violation of the OCPA, Plaintiff and Class Members have suffered damages for which Defendant is liable.

287.    Plaintiff and Class Members seek actual damages and the costs of litigation including attorneys' fees, as well as all other just and proper relief afforded by the OCPA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, JANE DOE, Individually, and on behalf of all others similarly situated, prays for judgment as follows:

A.    for an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.    for an award of actual damages, compensatory damages, consequential, nominal, and statutory damages, in an amount to be determined, as allowable by law;

C.    for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

D.    for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and unlawfully disclosed to third parties;

E.    for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

F.    for an award of punitive damages, as allowable by law;

G.    for an award of attorneys' fees under the common fund doctrine, the OCPA, and

65

**EXHIBIT 1**

any other applicable law;

H.     costs and any other expenses, including expert witness fees incurred by Plaintiff

       in connection with this action;

I.     pre- and post-judgment interest on any amounts awarded; and

J.     such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, by counsel, hereby demands a trial by jury on all issues so triable.

Dated: May 29, 2024

Respectfully submitted,

Jason B. Aamodt, OBA # 16974
Matthew D. Alison, OBA # 32723
**INDIAN & ENVIRONMENTAL LAW GROUP, PLLC**
223 S Detroit Ave., Suite 200
Tulsa, Oklahoma 74120
(918) 347-6169
(918) 948-6190 (facsimile)
jason@iaelaw.com
matthew@iaelaw.com
***Counsel for Plaintiff and the Proposed Class***

**EXHIBIT 1**





July 20, 2023

[Company]
[Address]
[City, State, Zip Code]
Attn: [Name of Recipient]

Re:    Use of Online Tracking Technologies

Dear [Name of Recipient],

The Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) and the Federal Trade Commission (FTC) are writing to draw your attention to serious privacy and security risks related to the use of online tracking technologies that may be present on your website or mobile application (app) and impermissibly disclosing consumers' sensitive personal health information to third parties.

Recent research,[1] news reports,[2] FTC enforcement actions,[3] and an OCR bulletin[4] have highlighted risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies

gather identifiable information about users as they interact with a website or mobile app, often in

---

[1] *See, e.g.*, Mingjia Huo, Maxwell Bland, and Kirill Levchenko, *All Eyes on Me: Inside Third Party Trackers' Exfiltration of PHI from Healthcare Providers' Online Systems*, Proceedings of the 21st Workshop on Privacy in the Electronic Society (Nov. 7, 2022), https://dl.acm.org/doi/10.1145/3559613.3563190.

[2] *See, e.g.* Todd Feathers, Katie Palmer, and Simon Fondrie-Teitler, *Out of Control: Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, THE MARKUP (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies.

[3] *U.S. v. Easy Healthcare Corp.*, Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; *In the Matter of BetterHelp, Inc.*, FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; *U.S. v. GoodRx Holdings, Inc.*, Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *In the Matter of Flo Health Inc.*, FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/cases-proceedings/192-3133-flo-health-inc.

[4] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

ways which are not avoidable by and largely unknown to users.

Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.

### Health Insurance Portability and Accountability Act of 1996 (HIPAA)

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium.

The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (*e.g.,* tracking technology vendors) includes PHI. HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules. OCR's December 2022 bulletin about the use of online tracking technologies by HIPAA regulated entities provides a general overview of how the HIPAA Rules apply.[5] This bulletin discusses what tracking technologies are and reminds regulated entities of their obligations to comply with the HIPAA Rules when using tracking technologies.

### FTC Act and FTC Health Breach Notification Rule

Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. This is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes. As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app.[6] The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[7] Within the last few months, the FTC has issued a series of guidance pieces addressed to entities collecting,

---

[5] *Id.*

[6] *See supra* note 3.

[7] *See* Federal Trade Comm'n, *Statement of the Commission on Breaches by Health Apps and Other Connected Devices* (Sept. 15, 2021), https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf.

**EXHIBIT 1**

using, or disclosing sensitive health information.[8]

OCR and the FTC remain committed to ensuring that consumers' health privacy remains protected with respect to this critical issue. Both agencies are closely watching developments in this area. To the extent you are using the tracking technologies described in this letter on your website or app, we strongly encourage you to review the laws cited in this letter and take actions to protect the privacy and security of individuals' health information.[9]

Sincerely,

/s/

Melanie Fontes Rainer
Director
Office for Civil Rights
U.S. Department of Health and Human Services

/s/

Samuel Levine
Director
Bureau of Consumer Protection
Federal Trade Commission

---

[8] *See, e.g.*, FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking* (Mar. 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking; Lesley Fair, *First FTC Health Breach Notification Rule case addresses GoodRx's not-so-good privacy practices* (Feb. 1, 2023), https://www.ftc.gov/business-guidance/blog/2023/02/first-ftc-health-breach-notification-rule-case-addresses-goodrxs-not-so-good-privacy-practices; Federal Trade Comm'n and the U.S. Department of Health & Human Services' Office of the National Coordinator for Health Information Technology (ONC), Office for Civil Rights (OCR), and Food and Drug Administration (FDA), *Mobile Health App Interactive Tool* (Dec. 2022), https://www.ftc.gov/business-guidance/resources/mobile-health-apps-interactive-tool; Kristin Cohen, *Location, health, and other sensitive information: FTC Committed to fully enforcing the law against illegal use and sharing of highly sensitive data* (July 11, 2022), https://www.ftc.gov/business-guidance/blog/2022/07/location-health-and-other-sensitive-information-ftc-committed-fully-enforcing-law-against-illegal.
[9] In addition to the HIPAA Rules, the FTC Act, and the FTC Health Breach Notification Rule, you may also be subject to other state or federal statutes that prohibit the disclosure of personal health information.

**EXHIBIT 1**

# INTEGRIS

## NOTICE OF PRIVACY PRACTICES

**THIS NOTICE DESCRIBES HOW YOUR MEDICAL INFORMATION MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.**

The INTEGRIS hospitals, clinics and other provider entities (hereafter referred to as "INTEGRIS") are required to maintain the privacy of your protected health information and to provide you with a notice of our privacy practices. Protected health information (hereafter referred to as "PHI") is information that individually identifies you and pertains to your past, present, or future health status. To promote quality of care, INTEGRIS maintains an electronic health record ("EHR"). The privacy obligations of INTEGRIS apply to information stored in your EHR. INTEGRIS and the individual members of its professional staffs are providing you with a joint Notice with respect to services provided by INTEGRIS. Please note that the independent members of the professional staffs are neither employees nor agents of INTEGRIS, but are joined under this Notice for the convenience of explaining how, when, and why we use and disclose your PHI. We will not use or disclose your PHI except as described in this Notice. In certain situations, we must obtain your written authorization in order to use and/or disclose your PHI. With some exceptions, we may not use or disclose any more of your PHI than is necessary to accomplish the purpose of the use or disclosure. This Notice applies to all PHI generated or maintained by INTEGRIS facilities.

**TREATMENT, PAYMENT & HEALTH CARE OPERATIONS**: We do not need any type of authorization from you in order to treat you, obtain payment for services provided to you and conduct our "healthcare operations" as discussed below.

**Treatment**: We may use your PHI to provide you with medical treatment and services. We may disclose your PHI to physicians, nurses, technicians, medical students, and other health care personnel who need to know your PHI for your care and continued treatment. Different hospital departments may share your PHI in order to coordinate services, such as prescriptions, lab work, x-rays and other services. For example, your physician may need to tell the dietitian if you have diabetes so we can arrange appropriate meals. We may make your PHI available electronically through a secure state, regional or national exchange service to other healthcare providers, health plans and healthcare clearinghouses that request your information for treatment or payment for that treatment. We may use and disclose your PHI to tell you about or arrange for possible treatment options for your continued care after you leave INTEGRIS, such as rehabilitation, home care or nursing home services, family members, clergy or others who may care for you.

**Payment**: We may use and disclose your PHI for the purpose of determining coverage, billing, collections, claims management, medical data processing, and reimbursement. PHI may be released to an insurance company, third party payer or other entity (or their authorized representatives) involved in the payment of your medical bill and may include copies or excerpts of your medical record that are necessary for payment of your account. For example, a bill sent to a third party payer may include information identifying you, your diagnosis, procedures and supplies used. We may also tell your health plan about a treatment you are going to receive in order to obtain prior approval or determine whether your plan will cover the treatment.

**Healthcare Operations**: We may use and disclose your PHI during healthcare operations. These

1

uses and disclosures are necessary to run the hospital and make sure our patients receive quality care. Common examples include conducting quality assurance, performance improvement, utilization review, medical review, peer review, internal auditing, investigation of complaints, accreditation, certification, licensing, credentialing, medical research, training and education. For example, we may use your PHI to contact you for the purpose of conducting patient satisfaction services or we may disclose your PHI to a pharmaceutical company in assessing your eligibility for pharmaceutical assistance programs.

### SPECIAL CIRCUMSTANCES:

Emergencies: Your authorization is not required if you need emergency treatment. We will try to get your authorization as soon as practical after the emergency.

Mental Health/Substance Abuse: In certain circumstances, we may not disclose your PHI, including psychotherapy notes, to you without the written consent of your physician or to others without your written authorization or a court order.

### OTHER USES AND ISCLOSURES:

Family/Friends/Caregivers: Unless you object in writing, we may disclose your PHI to a friend, family member or other caregiver who is involved in your medical care or who helps pay for your care. We may also tell your family or friends about your location of care, general condition or death. We may disclose your PHI to an entity assisting in a disaster relief effort so that your family can be notified about your condition, status and location. If you are unable or unavailable to agree or object, we will use our best judgment in communicating with your family and others.

Inpatient Hospital Directories/Clergy: Unless you object in writing, we may include certain limited information about you in a hospital directory while you are a patient at an INTEGRIS hospital. This information may include your name, location in the hospital, your general condition (e.g., fair, stable, etc.) and your religious affiliation. This is so your family and friends can visit you and generally know how you are doing. The directory information, except for your religious affiliation, may also be released to people who ask for you by name. Your name or religious affiliation may be given to a member of the clergy affiliated with the hospital or a member of the community clergy, such as a priest or rabbi, who asks for you by name or by religious affiliation.

Communications: We may use and disclose your PHI to contact you for a variety of reasons, such as appointment reminders, refill reminders, financial clearance, or to obtain additional information. This may be done by letter, email, automated system or by another method of communication. If you are not home, we may leave a message on an answering machine or with the person answering the telephone. Generally, we will use the address, telephone number and, in some cases, the email address you give us to contact you.

Health-Related Business and Services: Provided we do not receive any payment for making these communications, we may use and disclose your PHI to tell you of health- related products, benefits or services related to your treatment, case management, care coordination, or to direct or recommend alternative treatments, therapies, providers or care settings.

Health Information Exchange: We may participate in a secure state, regional or national health information exchange ("HIE"). Generally, an HIE is an organization in which providers exchange patient information in order to facilitate health care, avoid duplication of services (such as tests) and to reduce the likelihood that medical error will occur. By participating in a HIE, we may share your PHI with other providers that participate in the HIE or participants of

**EXHIBIT 1**

other health information exchanges. If you do not want your medical information to be available through the HIE, you must request a restriction using the process outlined below.

**Business Associates:** We may disclose your PHI to business associates with whom we contract to provide services on our behalf. Examples of business associates include copy services used to copy medical records, consultants, accountants, lawyers, medical transcriptionists and third-party billing companies. We will only make these disclosures if we have received satisfactory assurance that the business associate will properly safeguard your PHI. Each business associate is required to receive satisfactory assurances from its subcontractors that they will likewise properly safeguard your PHI.

**Research:** Under certain circumstances, we may use and disclose your PHI to researchers whose clinical research studies have been approved by an Institutional Review Board ("IRB"). While most clinical research studies require patient consent, there are some instances where your PHI may be used or disclosed pursuant to IRB waiver or as required or permitted by law. For example, a research project may involve comparing the health and recovery of all patients with the same medical condition who received one medication to those who received another. PHI may be disclosed to researchers preparing to conduct a research study, for example, to help them look for patients with specific medical needs, so long as the PHI they review does not leave the hospital. PHI regarding people who have died may be disclosed without authorization in certain circumstances.

**Limited Data Set:** If we use your PHI to make a "limited data set," we may give the "limited data set" that includes your information to others for the purposes of research, public health action or health care operations. We must make reasonable efforts to limit use, disclosure of, and requests for PHI to the *minimum necessary* to accomplish the intended purpose of the use, disclosure or request. The persons who receive "limited data sets" are required to agree to take reasonable steps to protect the privacy of your medical information.

**Limited Marketing Purposes:** We must obtain your authorization for any use or disclosure of PHI for marketing, except if the communication is in the form of: (a) a face-to-face communication made by INTEGRIS to an individual; (b) a promotional gift of nominal value; or (c) falls under an exception recognized by HIPAA. For example, we may provide free baby products to new mothers. With some exceptions, marketing includes any type of communication for treatment and health care operations when INTEGRIS is paid to provide the communication. If we receive any form of payment for a marketing communication, we must obtain your authorization and tell you that payment is involved. Marketing does not include communications pertaining to (i) refill reminders so long as any payment received is limited to the cost of making the communication; (ii) case management; (iii) care coordination; (iv) communications that merely promote health in general; and (v) communications to you concerning health-related products, benefits or services related to your treatment or alternative treatments, therapies, providers or care settings.

**Workers' Compensation:** We may disclose your PHI for workers' compensation or similar programs in order to comply with workers' compensation and similar laws.

**Organ and Tissue Donation:** We are required by federal law and accreditation standards to notify organizations that handle organ procurement, eye or tissue transplantation, and other entities engaged in the procurement, banking or transplantation of organs whenever there is a death in our facility. This is to facilitate organ or tissue donation and transplantation.

**EXHIBIT 1**

**Data Breach Notification Purposes:** We may use or disclose your Protected Health Information to provide legally required notices of unauthorized access to or disclosure of your health information.

**Regulatory Agencies:** We may disclose your PHI to a health oversight agency for activities required or permitted by law, including, but not limited to, licensure, certification, audits, investigations, inspections and medical device reporting. We may provide your PHI to assist the government when it conducts an investigation or inspection of a healthcare provider or organization.

**Law Enforcement:** We may disclose your PHI if asked to do so by law enforcement: (1) when we receive a court order, warrant, summons or other similar process; (2) to identify or locate a suspect, fugitive, material witness, or missing person; (3) when the patient is the victim of a crime, if we are unable to obtain the person's agreement; (4) when we believe the patient's death may be the result of criminal conduct; (5) about criminal conduct at the hospital; and (6) in emergency circumstances to report a crime, the location of a crime or victims, or the identity, description or location of the person who committed the crime.

**Lawsuits and Disputes:** If you are involved in a lawsuit or dispute, we may disclose your PHI in response to a valid court or administrative order. In limited circumstances, we may disclose PHI in response to a subpoena, discovery request or other lawful process, when required by law.

**Public Health:** As required or permitted by law, we may disclose your PHI to public health (including social service or protective services agencies) or legal authorities charged with preventing or controlling disease, injury or disability. For example, we are required to report births, deaths, birth defects, abuse, neglect, domestic violence, abortions, tumors, reactions to medications, device recalls, and various diseases and/or infections to government agencies in charge of collecting that information.

**Judicial and Administrative Proceedings:** We may disclose your PHI in the course of any administrative or judicial proceeding.

**Specific Government Functions:** We may disclose your PHI to military personnel and veterans in certain situations. We may disclose your PHI for national security purposes, such as protecting the President of the United States or conducting intelligence operations.

**Military/Veterans:** We may disclose your PHI as required by military command authorities, if you are a member of the armed forces.

**Inmates:** If you are an inmate of a correctional institute or under the custody of a law enforcement officer, we may release your PHI to the correctional institute or law enforcement official.

**Health & Safety:** In order to avoid a serious threat to the health and safety of a person or the public, we may disclose PHI to law enforcement personnel or persons able to prevent or lessen such harm. We may notify a person who may have been exposed to a disease or may be at risk for contracting or spreading a disease or condition as ordered by public health authorities or allowed by state law.

**School Immunizations:** We may disclose the immunization record of your minor student or prospective student to a school if: (1) state law requires the school to have proof of immunization; and (2) we obtain and document the agreement of you as the parent or guardian. Your agreement

4

**EXHIBIT 1**

may be in writing (but need not satisfy the requirements for a HIPAA authorization) or oral, in which case we must document the agreement.

**Records of Deceased Individuals:** We may disclose your PHI pursuant to either a court order or a written release of executor, administrator or other personal representative appointed by the court. If there is no such appointment, we may disclose your PHI to your spouse or responsible family member upon receipt of a signed written authorization.

**Required by Law:** We will disclose your PHI when required or permitted to do so by federal, state, or local law. For example, we are required to report criminally injurious conduct.

**Coroners, Medical Examiners, Funeral Directors:** We may release your PHI to a coroner or medical examiner. This may be necessary, for example, to identify a deceased person or to determine a cause of death. We may also release your PHI to funeral directors as necessary to carry out their duties.

**Prohibition on Sale of PHI:** We will not directly or indirectly receive remuneration or payment in exchange for any PHI unless INTEGRIS obtains a valid authorization that includes a specification of whether the PHI can be further exchanged for remuneration by the entity receiving PHI of the individual. The prohibition against selling PHI will not apply if the purpose of the exchange is for:

      (a)    public health activities (The Secretary may issue regulations limiting the price charged for PHI under this exception for public health activities);

      (b)    research, but only if the price charged reflects the costs of preparation and transmittal of the data for such purpose;

      (c)    treatment and payout purposes;

      (d)    healthcare operations associated with the sale, transfer, merger or consolidation of all or part of INTEGRIS;

      (e)    remuneration provided by INTEGRIS to a Business Associate pursuant to a legitimate Business Associate services contract or arrangement;

      (f)    providing an individual with a copy of his/her medical record; and

      (g)    as required by law any other purpose approved by the Secretary.

**Any Other Uses:** We must obtain a separate authorization from you to use or disclose your PHI for situations not described in this Notice.

**Fundraising:** We may use your PHI (specifically, demographic information related to you including name, address, telephone, other contact information age, gender, date of birth), the dates of your healthcare services, the department of service, treating physician, outcome information and health insurance status, to contact you about fundraising programs. If, in the past, you have been a donor to one of the INTEGRIS hospitals or programs, you may receive mailings related to specific areas or programs. We may disclose this information to a business associate or foundation to assist us in fundraising efforts. Each fundraising communication will include a clear and conspicuous statement allowing you the opportunity to elect not to receive any further fundraising communications. We will not send any further fundraising communications to you if you elect not

**EXHIBIT 1**

to receive them. INTEGRIS may permit you to opt back into receiving fundraising communications. We will not condition treatment or payment on your choice with respect to the receipt of fundraising communications.

**Note: If you do not want to be contacted for fundraising efforts, you must notify the INTEGRIS Privacy Officer in writing at the address shown at the bottom of this Notice or you may email INTEGRIS at INTEGRISPrivacy@integrisok.com.**

### PATIENT HEALTH INFORMATION RIGHTS:

Although all records concerning your hospitalization and treatment at an INTEGRIS facility are the property of INTEGRIS, you have the following rights concerning your PHI.

**Right to Receive Electronic Copy of Your PHI (fees may apply):** If INTEGRIS uses or maintains an electronic health record, or EHR, you have the right to receive a copy of such information in an electronic format upon request. The electronic copy will be provided in the form or format you request, if it is readily producible in such form or format; or if not, in a readable electronic form and format as agreed to by you and INTEGRIS. In addition, if you direct INTEGRIS will transmit the copy, whether in electronic or paper form, directly to an entity or person designated by you. Your request must be in writing, signed, and clearly identify the designated person and where to send the copy of your PHI.

**Right to Confidential Communications:** You have the right to receive confidential communications of your PHI by alternative means or at alternative locations. For example, you may request that we only contact you at work or by mail. You must submit your request in writing and identify how or where you wish to be contacted. We will accommodate all reasonable requests.

**Right to Inspect and Copy:** You have the right to inspect and copy your PHI as provided by law. This right does not apply to psychotherapy notes. Your request must be made in writing. We have the right to charge you the amounts allowed by state or federal law for such copies. We may deny your request to inspect and copy in certain circumstances. If you are denied access, you may request that the denial be reviewed. A licensed healthcare professional chosen by us will review your request and the denial. The person conducting the review will not be the person who denied your request. We will comply with the outcome of the review.

**Right to Amend:** If you feel that the PHI we have about you is incorrect or incomplete, you have the right to request an amendment of your PHI. You must submit your request in writing and state the reason(s) for the amendment. We may deny your request for an amendment if (1) the request is not in writing or does not include a reason to support the request; (2) the information was not created by us or is not part of the medical record that we maintain; (3) the information is not part of the information that you would be permitted to inspect or copy; or (4) the information is accurate and complete. If we deny your amendment, you have a right to file a statement of disagreement with our Privacy Officer.

**Right to an Accounting:** You have the right to obtain a statement of certain disclosures of your PHI to third parties, except those disclosures made for treatment, payment or healthcare operations, authorized by you or pursuant to this Notice. To request this list, you must submit your request in writing and provide the specific time period requested. You may request an accounting for up to six (6) years prior to the date of your request (three years if PHI is an electronic health record). If you request more than one (1) accounting in a 12-month period, we may charge you for the costs of providing the list. We will notify you of the cost involved and you may choose to modify or withdraw your request before any costs are incurred.

6

**EXHIBIT 1**

Right to Request Restrictions on Disclosure(s): You have the right to request restrictions or limitations on PHI we use or disclose about you unless our use or disclosure is required or permitted by law. Any agreement to additional restrictions must be in writing and signed by a person authorized to make such an agreement on behalf of INTEGRIS. To request restrictions, you must make your request in writing and tell us (1) what information you want to limit; (2) whether you want to limit our use, disclosure or both; and (3) to whom you want the limits to apply. We will grant a request for restriction if (1) the disclosure is to a health plan for purposes of either payment or health care operations, and (2) the PHI pertains to a service for which you have already paid in full out-of-pocket. We are not required to honor other requests. However, if we agree, we will comply with your request unless the information is needed to provide emergency treatment to you.

Out-of-Pocket-Payments. If you have paid out-of-pocket in full prior to the provision of a specific health care item or service (in other words, you have paid in full and have requested that we not bill your health plan to obtain payment), you have the right to ask that your PHI with respect to that item or service not be disclosed to a health plan for purposes of payment or health care operations, and we will honor that request, unless we must disclose the information for treatment or legal reasons.

Right to Receive a Paper Copy of this Notice: You have the right to a paper copy of this Notice. If you have received this Notice in electronic form and would like a paper copy, please contact the INTEGRIS Privacy Officer at the number or email address listed below. You may obtain a copy at our website: www.integrisok.com.

Right to Revoke Authorization: You have the right to revoke your authorization to use or disclose your PHI, EXCEPT to the extent that action has already been taken by us in reliance on your authorization.

Right to Get Notice of a Breach. You have the right to be notified upon a breach of your unsecured PHI. In some circumstances, our business associate may provide the notification. If you have provided us with a current email address, we may use email to communicate information related to the breach. We may also provide notification by other methods as appropriate.

CHANGES TO THIS NOTICE: We will abide by the terms of the Notice currently in effect. We reserve the right to change the terms of its Notice and to make the new Notice provisions effective for all PHI we maintain. We will provide you with the revised Notice at your first visit following the revision of the Notice.

OWNERSHIP CHANGE: In the event that an INTEGRIS hospital is sold or merged with another organization, your PHI may become property of the new owner.

NOTICE EFFECTIVE DATE: September 1, 2013.
Original Notice April 14, 2003.  Revised September 28, 2004, January 12, 2010 and September 1, 2013.

---

TO REPORT A PRIVACY VIOLATION:
If you believe your privacy rights have been violated, you may call (405) 949-6081 (or toll-free at 1-877-805-9681), or send an email to INTEGRISPrivacy@integrisok.com or you may file a complaint with our Corporate Privacy Officer at:

**EXHIBIT 1**

INTEGRIS Corporate Privacy Officer
3030 N.W. Expressway, Suite 501
Oklahoma City, Oklahoma 73112-5466

You may also report a privacy rights violation to the Secretary of the Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201. All complaints must be in writing and filed within 180 days of when you knew or should have known that the act or omission complained of occurred. You will not be penalized for filing a complaint.

(Form 1678 - Version #4 – Rev. 9/1/13)

**EXHIBIT 1**